[Civ. No. 16913.   First Dist., Div. One.   June 28, 1956.]

CIRO'S OF SAN FRANCISCO (a Corporation), Appellant,
v. STATE BOARD OF EQUALIZATION, Respondent.

James Martin MacInnis and Harry P. Glassman for Appellant.

Edmund G. Brown, Attorney General, and Charles A. Barrett, Deputy Attorney General, for Respondent.

BRAY, J.—The State Board of Equalization revoked petitioner's on-sale liquor license.  Petitioner applied to the superior court for a writ of mandamus to review the board's action and to restore the license.  After a hearing held upon the transcript and record of the proceedings before the board, the court made findings of fact and conclusions of law to the effect that the board's action was supported by the weight

of the evidence and upheld the board's action. Judgment was then entered denying the writ. Petitioner appeals.

## QUESTIONS PRESENTED

1. Sufficiency of evidence.
2. Is the penalty excessive?

## EVIDENCE

Petitioner is a California corporation operating a tavern in San Francisco. The accusation upon which the board acted charged petitioner with violating section 24200, Business and Professions Code (Alcoholic Beverage Control Act) and article XX, section 22, California Constitution, in that from January 15, 1953, to November 6, 1953, it employed as a manager Renaldo Ferrari, a person who did not have the qualifications of a licensee because of a police record, and that from January 15, 1953, until September 18th, it employed as manager Anthony Tomasello and also permitted him to own one-third of the corporate stock, he likewise being a person who because of a police record could not qualify as a licensee. The accusation charged that because of those facts "the continuance of a license would be contrary to public welfare or morals." (§ 24200, subd. (c).)

█ Ciro's corporation first became licensed to operate a tavern in 1951. At that time its board of directors consisted of William J. Parker, Doris B. Zweirin and Kenneth C. Zweirin. In its application for the license it specifically agreed that any manager employed in the business would have all the qualifications required of a licensee. December 13, 1952, Ferrari, Tomasello and Wallace Scott as copartners opened a commercial account at the Bank of America. The title of the account was "Ciro's Special" at the address 645 Geary (petitioner's tavern) with the business listed as "tavern." Withdrawals could be made upon the signature of any two of the three copartners. January 5, 1953, all members of the board resigned effective January 15th. January 14th, Richard Ferrari, Renaldo's son, borrowed $5,000 from his father to invest in the corporation and immediately gave his father a power of attorney to collect and deposit moneys, to endorse checks, to enter into written agreements, documents or commitments, including the borrowing of money or hypothecating of property, all on the son's behalf. It specifically empowered Renaldo "to do any act or thing in relation to the operation, management, ownership and/or transfer of the same in and to" Ciro's tavern, "or to do any act or

thing in relation to the ownership of that certain California corporation known as CIRO'S OF SAN FRANCISCO, INC.'' The next day the ownership of the corporation was transferred to the following stockholders: Richard Ferrari, Scott and Tomasello. At a special stockholders' meeting then held, the above three being present, the board of directors was instructed to hold a special meeting later in the day to elect officers and to make application to the corporation commissioner for authority to issue stock. The meeting was held. Scott was elected president, Richard vice president and one Florence Da Ros secretary treasurer. The officers were authorized to open an account with the Bank of America. January 29th the account was opened in the name of Ciro's of San Francisco, withdrawals to be made by any two of the following three: *Renaldo* Ferrari, Tomasello and Scott. The previously opened ''Ciro's Special'' account was closed, reason ''new account.'' At the meeting Scott stated that the officers should immediately file with the state board an application for a transfer of the liquor license to the corporation. January 20th, Scott, Richard and Da Ros filed with the board information concerning their background. Richard was in the air force, stationed in Alaska during this period and was only active in the management of the business when home on furlough. Scott was the president of the corporation and under the by laws was to have ''general supervision, direction and control of the business affairs of the corporation,'' subject to the control of the board of directors. He testified that he did the managing of the business, the hiring and firing of employees, etc., and not Renaldo or Tomasello. (He also acted as a bartender.) It is significant, however, that checks on the corporation bank account could be signed by Tomasello and Renaldo alone. The resolution of the corporation and the bank signature card provided that any two of the three, Tomasello, Scott and Renaldo, were authorized to sign ''checks, drafts and all other paper issued in said trade.'' Renaldo testified that the president of the corporation ''had given me permission to sign different contracts'' for the corporation and that he did sign such.

*Renaldo* began to work at the tavern December 15, 1952, and for the corporation January, 1953. He stated that he was hired by Scott and Richard as a bartender at union scale. He did not receive pay until the corporation was in a position to pay, starting approximately August, 1953. Renaldo in the course of his work was authorized to sign

checks and contracts for the corporation. He also did a few odd jobs on the premises and "might" have signed for materials delivered to the corporation. His criminal record shows numerous arrests and convictions resulting in imprisonment for violation of state and federal narcotics laws. Tomasello's record shows two convictions and imprisonment on narcotics charges. Tomasello also acted as bartender from January, 1953, on. Besides authority to sign checks, he owned one-third of the corporate stock, although it appears that after his second arrest he transferred his stock to Richard and Scott, and left his employment. This was some time between September 23, 1953, and January 19, 1954.

1. *Sufficiency of Evidence.*

Petitioner concedes that both Renaldo and Tomasello did not possess the qualifications required of licensees. It contends, however, that the evidence does not show by convincing proof to a reasonable certainty* that Renaldo and Tomasello acted as managers.

In *Gordon* v. *Industrial Acc. Com.* (1926), 199 Cal. 420, 427 [249 P. 849, 58 A.L.R. 1374] the court said: ". . . a managing agent or a managing representative is one who has general discretionary powers of direction and control— one who may direct, control, conduct or carry on his employer's business or any part or branch thereof."

There has been no explanation by the Legislature as to what it meant by "manage" as used in section 23788 of the Alcoholic Beverage Control Act. It is of some value to note that in that section the Legislature used the words "manage, direct, or conduct . . ." Each of these words suggests "control."

Without reviewing all the facts relating to Renaldo's employment at Ciro's, it is clear that there was substantial proof that he did exercise managerial powers. He was one of the three persons, any two of which could sign checks for the corporation; he was authorized to sign contracts for the corporation; he performed odd jobs around the premises even though he was supposedly hired as a bartender; and he held a power of attorney from his son, a stockholder, director and vice president of the corporation, which per-

*It does not contend that if the evidence so shows such facts would not be contrary to public welfare and morals, and would not constitute a violation of section 24200, subdivision (a), Business and Professions Code, and of article XX, section 22 of the Constitution.

mitted Renaldo, through the by laws, to exercise some control over the president of the corporation.

The evidence also reveals that Tomasello had the power, in conjunction with one of the two other authorized persons, to sign checks for Ciro's; he was owner of one-third of the stock of the corporation; and that, although he was employed as a bartender starting January, 1953, he received no pay until July, 1953. This is sufficient evidence to support the board's finding that Tomasello had managerial powers.

Petitioner contends that the ownership by Tomasello of one-third of the stock of the corporation does not justify a revocation of the license, as it contends there is no inhibition in the law against a person who is not qualified to obtain a liquor license, owning stock in a corporation which holds one. It is not necessary to consider the effect of Tomasello's stock ownership except as it bears on his managing and conducting the business. Tomasello's acts as well as those of Renaldo in this respect show clearly that both were acting in connection with the business in a manner such as to make the continuance of the license contrary to public welfare and morals. As to Tomasello, this is true, whether his ownership of one-third of the stock of the corporation itself would or would not be cause for revocation of the license.

It should be noted that Renaldo, Tomasello and Scott held the bank account for Ciro's tavern, prior to the incorporation. Thereafter the same three had full charge of the corporation's bank account.

2. *Penalty.*

█ Characterizing the violations found by the board as merely technical ones, petitioner contends that the board abused its discretion in the penalty imposed, namely, revocation of the license. We fail to see, however, that the violations were merely technical.* It requires no extended argument to prove that premises licensed to dispense alcoholic beverages should not be operated by law violators, particularly those convicted of heinous crimes of the type of narcotics violations. It is a well known fact that much of the narcotic traffic centers in and around taverns. Renaldo in 1937 was convicted of transporting morphine and also of possession thereof. Apparently the one year he served in the county jail therefor did not cause him to cease trafficking in

---

*Therefore we deem it unnecessary to discuss the question of this court's power concerning administrative penalties.

narcotics. In 1947 he was convicted of concealing narcotics and was sentenced to the federal penitentiary for three years and one day. Tomasello in 1944 pleaded guilty to possession of marijuana and was sentenced to 90 days in the county jail. He, too, did not profit therefrom, for in 1953 he was again sentenced to the county jail, this time for five months, on a plea of guilty of possession of marijuana. Even though there was no evidence in this case of questionable activities at Ciro's, the flouting of the law by petitioner, the importance of a strict enforcement of the law as to the character of the persons to be permitted the privilege of liquor licenses, the danger to the public welfare and morals to which the corporation subjected the public by employment in the capacities here shown of men with prohibited backgrounds, and the circumstances of this case, negative any contention of abuse of discretion in the penalty imposed. The board did what petitioner, quoting "the philosophy of the Mikado and 'make the punishment fit the crime,'" says it should be required to do.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.